## JAKE JOHNSON v. THE STATE.

1. In the enactment of the acts of Congress known as the reconstruction laws, the National Legislatue has used its legitimate powers with moderation and magnanimity, endeavoring to encourage the formation of republican governments in the rebel States, and to bring their people back to a due appreciation of law, and of that liberty which is secured to every citizen under the Constitution of the United States.

2. The third section of the act of Congress of March 2, 1867, entitled "An act to provide for the more efficient government of the rebel States," clearly recognized the existence within those States of local civil tribunals, with competent jurisdiction to try criminals; and the military commanders, who were charged with the administration of that and the amendatory acts of Congress, uniformly allowed such tribunals to continue in the exercise of their powers.

3. The Criminal Court of the county of Harris was created by the Legislature of 1866, and was in existence when the reconstruction laws of Congress were passed, and neither by them nor by any order of the military commanders has it been abolished. On the contrary, section four of General Orders No. 74, dated Headquarters Fifth Military District, April 16, 1870, directs all civil officers to continue their functions until relieved by qualified successors.

4. The Criminal Court of the county of Harris was a legal tribunal in April, 1870, with competent jurisdiction to try criminals.

5. There is no legal principle requiring a jury to disbelieve the evidence of an accomplice; though it is positive law in some of the States, and the better opinion in this one, that uncorroborated evidence of an accomplice will not support a conviction.

6. In the course of the trial of one of several defendants who were jointly indicted for murder and had severed in their defenses, the court below allowed the district attorney to call up the case of another one of the defendants, and to enter in it a *nolle prosequi* for the purpose of making him a witness against the defendant on trial. *Held,* that there was no error in such action.

7. An exception to an indictment on the ground that the grand jury who found it were not drawn and summoned according to law, was in the nature of a challenge to the array; and was properly overruled. (Paschal's Digest, Art. 2868.)

Appeal from the Criminal Court of the county of Harris. Tried below before the Hon. Samuel Dodge.

At the February term, 1870, of the Criminal Court of Harris county, an indictment was found and returned against Jake Johnson, John Jemison, Dock Wheeler, and Jules Mitchell, for the murder of B. W. Loveland, on the first of December, 1869. The indictment alleged that the murder was committed with an iron dray pin, and charged Jemison with having struck the fatal blow with it, and the other defendants with being present, aiding and abetting.

Loveland kept a provision or family grocery store on Fannin street, in the city of Houston. He was found dead in his store on the evening of December 1, 1869, evidently from the effect of a wound on the back of the head, by which the skull was crushed. An iron dray pin, with blood upon it, was found on or near the premises, and by adjustment of it to the wound, it was found, according to the testimony of surgeons and other witnesses, that it was such an instrument as would produce such a wound.

At the April term, 1870, and on the twentieth of that month the case came up for trial. The defendants asked and obtained a severance in their trials, and the State elected to proceed first with the case against the appellant, Jake Johnson.

He filed in the first instance a plea to the jurisdiction of the court, alleging, first, that Samuel Dodge, presiding as judge of the court, had no authority of law to try and determine the cause, because he had never been elected by the qualified electors, as provided by the act of October 20, 1866, by which the court was created; but claimed to be judge by virtue of an order from one J. J. Reynolds, styling himself Brevet Brigadier General in the army of the United States.

Second—That J. J. Reynolds had no authority under the laws of this State, nor under the Constitution and laws of the United States, to appoint a judge of the court.

Third—That the said Reynolds claimed authority to make such appointment under an act passed by the Congress of the United States, entitled "An act to provide for the more efficient government of the rebel States," passed March 2, 1867, and amended March 27 and July 13, 1867.

Fourth—That these several acts of Congress were in derogation of the Constitution of the United States, and therefore void.

Fifth—That the action of said Reynolds in appointing said Dodge, and of said Dodge in presiding as judge of the court, were in direct violation of the laws of this State, and of the Constitution and laws of the United States.

Sixth—In case the said acts of Congress, and the action of said Reynolds and Dodge, be held valid, then that this court has no jurisdiction to try and determine this case, because this court was organized by an act of the Legislature in 1866, and the act of Congress of March 2, 1867, declares that there was then no legal State government in the State of Texas, and this court, having been organized under the then State government, is without authority and void.

Seventh—That this court having no authority to impannel a jury, it cannot try the defendant on the indictment presented.

Eighth—The Constitution of the State of Texas, adopted by the people November 30, 1869, and approved by the Congress of the United States, March 31, 1870, abolishes this court, and hence it has no jurisdiction to hear and determine this cause.

This plea was verified by the defendant's affidavit that he was advised, and therefore stated its allegations to be true.

The court overruled the exceptions, and the defendant reserved exceptions to the ruling.

The defendant, in the next place, filed under oath an exception to the indictment, averring that " the grand jury impaneled, and which presented the bill of indictment against him, were not drawn and summoned as required by law." This was also overruled, and exceptions reserved to the ruling.

The case then went to trial by a jury.   The district attorney, being desirous of using Jules Mitchell as a witness against the appellant, was permitted by the court to call up the indictment against him, and to enter a *nolle prosequi*—it being stated by the district attorney that there was not sufficient evidence to convict the defendant Mitchell.   The defendant Johnson duly interposed objection to this action of the court and district attorney, and on being overruled, reserved exceptions.

The order of the evidence in the statement of facts indicates that a good deal of the State's evidence had been given to the jury before Mitchell was put upon the stand.   He prefaced his testimony by declaring that no promises nor threats had been used to influence his evidence, and that he had not been informed that the prosecution against him would be dismissed.

He testified that one evening in 1869, while the election for Governor was going on, (about first of December,) he went into the front room of a small house on Congress street, in Houston, where he and Dock Wheeler kept a grocery.   The house had a front room and a back room.   Witness went behind the bar to get a drink, and making a noise, he was asked by Wheeler from the back room who it was.   Witness replied, "it is me," and Wheeler said "all right."   Witness looked through the key hole and saw Jake Johnson and Dock Wheeler in the back room, counting money.   They soon came into the front room.   Jake Johnson had three greenback notes in his hand, and asked witness what size they were.   Witness told him they were a twenty, a ten and a five, and he, Johnson, then slapped his pocket and said he had plenty more.   Witness heard money rattle in his pocket.   Johnson had on light, striped cassimere pants, and witness saw several small spots of blood on them.   He asked Johnson what they meant, and Johnson replied, never mind, he would change his clothing.   Witness left for home soon afterwards, but saw Johnson the next morning, and he then had on new pants and boots, which he

said he had bought at auction the previous night. The next morning witness saw Johnson at the court house, where the election was going on. Witness said to him that a man, Mr. Loveland, had been found murdered ; to which Johnson replied, yes, and that he was going to get away from here. The night he saw Johnson at the grocery, the latter gave witness a five dollar bill, telling him to say nothing about what he saw or heard there. As soon as witness heard of the murder of Loveland he burned up the five dollar bill, being afraid of it. (The parties indicted were all men of color.)

There was no witness who saw the homicide committed, but there was other testimony besides Mitchell's, implicating the prisoner Johnson.

Adam Fritz, also a · colored man, testified that he had known Johnson all his life, they having belonged to the same master. Witness lived in Polk county ; and on Thursday before Christmas, 1869, Johnson came to witness's house in that county. He stayed there about a week, and witness made arrangements with him to work the next year on witness's farm. After Christmas Johnson left to go down to Houston and bring up his wife. While he was gone, intelligence of the murder of Mr. Loveland, and that Johnson was charged with it, reached witness and his family in Polk county; and when Johnson came back, witness's wife insisted that witness should drive him away. Witness took Jake and had a talk with him ; witness told him what he had heard about the killing of a man in Houston, and his being charged with it. Johnson told witness · that he did not kill Mr. Loveland, but that he was there when it was done and saw it; that he and Dick Wheeler and Jules Mitchell did it; that Mitchell struck Mr. Loveland with a dray pin while he was drawing a bottle of molasses ; that they did it for his money, and got a tin box with one hundred and sixty dollars in it, a silver watch and a pistol; that they did it in Loveland's store about eight o'clock at night, while

the election was going on.   He said that he did not do it; he was clear of it ; that he had been tried by the masons and found clear; that he kept watch while the others were doing it.   And finally, this witness testified that he and Jake had some talk with Squire Eagan about it, and Squire Eagan told Jake that he did not think that he could be found guilty of killing Mr. Loveland.

It was in proof that the deceased, when found, appeared to have been dead for several hours, perhaps a day.   Molasses was spilled around on the floor, and from the indications the witnesses inferred that he was struck from behind while in the act of drawing molasses from a barrel.

The jury returned a verdict of guilty of murder in the first degree, and the court below pronounced sentence of death, but suspended execution of the sentence to await the determination of this appeal.

The opinion of the court indicates sufficiently the objections urged to the charges given and refused by the court below.

*W. R. Henderson,* for the appellant, argued at length that the reconstruction acts were unconstitutional, and that, on the hypothesis of their constitutionality, the Criminal Court of Harris county had ceased to have a legal existence on the thirty-first of March, 1870, when the State Constitution of 1869 was approved by the Congress of the United States.

Counsel presented the other questions in the manner following:

The action of the court in permitting the district attorney, in the midst of the trial of the appellant, to enter a *nolle prosequi* as to Jules Mitchell, f. m. c., who had been jointly indicted with the appellant, and who also had been arraigned with him, has also been assigned for error.   Jules Mitchell was jointly prosecuted with the appellant; he had been indicted and arraigned with him. Article 3054 of Paschal's Digest says very explicitly, " when it is apparent that there is no evidence against a defendant, in any

case where he is jointly prosecuted with others, the jury may be directed to find a verdict as to such defendant; and if they acquit he may be introduced as a witness in the case." As it will appear from an inspection of the record, the district attorney simply stated that after a thorough investigation of the case he was satisfied that there was not sufficient evidence to convict him; and upon that bare statement Mitchell was discharged and introduced as a witness, when this statute pointedly says that his competency cannot be re-established and his discharge from the accusation pending against him effected except by a verdict; and it also plainly and expressly negatives the idea that he can be discharged and placed upon the stand as a witness, upon the naked statement of the district attorney, in the absence of any trial before a jury, and a verdict of acquittal by that jury. The jury, according to the plain meaning of this statute, are the exclusive judges of the guilt or innocence of the party, and not the district attorney.

In reference to the special exception to the indictment on the ground that the grand jury was not drawn and summoned according to law, I will say that your Honors will find by an inspection of the record that it was too late to make a challenge to the array when the indictment against the appellant was presented; and further, that counsel were not appointed by the court to defend the appellant until two months after he had been indicted. When the grand jury were impanneled at the February term, the appellant had no counsel, and the only way, I maintain, that this point could be raised was in the way in which it was sought. The case in 22 Texas, 215, fully sustains this position.

*E. B. Turner,* Attorney General, for the State.—The first point I will notice is the exception to the sufficiency of the indictment, because the grand jury was not drawn and summoned according to law.

This cannot be a good reason why the indictment is not good as

an indictment.   The party, however, evidently undertook to challenge the array ; but the same does not amount to a challenge, as article 363 gives the causes, and they are not assigned.   Nor can he raise the question upon the trial under the code.   (Paschal, Art. 2868 ; Martin v. The State, 22 Texas, 215.)

This case, and all previous ones tried before the code took effect, of course establish for themselves a different rule ; but this case decides the law under the code and as applicable to this case. The objections to the jurisdiction of the court I will not notice. Nor will I notice the point made that the Constitution of 1867 abolishes the court.   (See § 1, Art. 5, Constitution.)

Jules Mitchell was indicted with the defendant, but *nol. pros.* was entered as to him, and he was offered as a witness for the State.   Defendant asked a charge in regard to the testimony of the witness which was refused, because given in substance in charge in chief.   Now, I do not think the charge was given in substance in chief.   Was the charge one, then, which ought to have been given under the circumstances ?   And did it embrace any true principle of law ?   The charge does not embrace any true rule of law, and therefore should not have been given.   An accomplice cannot be a witness for the defense.   (Paschal, Art. 1826.)   This does not deprive the State from using them.   The question is, what value shall be put to this testimony ?   (See Wharton Crim. Law, p. 366.)

The rule, however, sought to be invoked should not have weight as the prosecution against Mitchell had been dismissed, and he was competent for either, and credibility alone, like any other witness, was the question.   Mitchell's testimony, it will be remembered, is not the important testimony in the case.   He is sustained, so far as we can judge, in all that he says by other witnesses, except in one particular, and that is the negro woman (prostitute) says she heard Mitchell, Wheeler and Johnson whispering and counting money in the back room of the Wheeler grocery.   Mitchell says

XXXIII—37

he did not go into the back room, but he saw Johnson and Wheeler through the keyhole, and May says she saw all three, or heard all three in the front room whispering, etc. The point, however, which I make is that Mitchell's testimony might be entirely excluded, and still the verdict would be fully sustained; the point of discrepancy is entirely immaterial.

Complaint is made of the charge. The court gave a long charge and clear, except in one paragraph, where the judge undertakes to say: "If the means used are not such as establishes the formed design, still, if the killing was in fact done with malice aforethought, it would be murder in the first degree, although the deliberate purpose had existed but for a moment." But the charge as a whole cannot be mistaken.

The court should have charged specifically upon the clause which makes it murder in the first degree to kill in the attempt to rob, as this case was clearly a killing for the purpose of committing a felony.

The judgment should be affirmed.

WALKER, J.—The appellant was tried and convicted for the murder of B. W. Loveland, at the Spring term of the Criminal Court of Harris county.

There are six assignments for error brought to this court, which are as follows:

First—The court erred in overruling the special pleas of the defendant to the jurisdiction of the court.

Second—That the court erred in sustaining the exception of the State to the pleas of the defendant to the jurisdiction of the court.

Third—The court erred in overruling the special exception to the indictment.

Fourth—The court erred in allowing the State of Texas to take up the case of The State v. Julius Mitchell, who was jointly indicted with the said defendant while the trial of the defendant was in progress.

Fifth—The court erred in refusing the charge asked by the defendant.

Sixth—The court erred in overruling the motion for a new trial.

On the first of these exceptions to the jurisdiction, it is contended that the court before whom the case was tried had no legal existence. It was a court created by the Legislature of 1866, and reference is made to the act of Congress passed March 2, 1867 ; and the preamble to the act is thus cited :

" WHEREAS, No legal State governments or adequate protection for life or property now exists in the rebel States of Virginia, North Carolina, South Carolina, Georgia, Mississippi, Alabama, Louisiana, Florida, Texas and Arkansas ; and whereas, it is necessary that peace and good order should be enforced in said States, until loyal and republican State governments can be established, therefore," etc.

The first and second sections of the act go on to provide a mode of governing the rebel States by the military authority of the government. The third section reads as follows :

"*And be it further enacted*, That it shall be the duty of each officer assigned as aforesaid to protect all persons in their rights of persons and property, to suppress insurrection, disorder and violence, and to punish or cause to be punished all disturbers of the public peace and criminals; and to this end he may allow local civil tribunals to take jurisdiction of and to try offenders," etc.

This section clearly recognizes the existence of local civil tribunals, with competent jurisdiction to try offenders and criminals, and it is perhaps useless to say that the military commanders, as well as this court, have never doubted the legal existence of these civil tribunals. The military commanders were fully authorized, in certain cases, to adopt other modes of trial; but, we believe, they have uniformly preferred that persons accused of crime should be tried by the civil courts when there was even a remote

probability of the ends of justice being met, and have used the military authority with great reluctance and moderation.

The acts of Congress passed March 2 and March 23, and July 13, 1867, gave to the rebel States provisional governments which were intended to make as few innovations upon the civil authorities, and do as little violence to the popular ideas of State government as possible under all existing circumstances.

The national legislature used its legitimate powers with moderation and magnanimity, endeavoring to encourage the formation of republican governments in these States, and bring the people back to a due appreciation of law, and the liberty which is secured to the free enjoyment of every citizen under the Constitution of the United States.

The court in which the appellant was tried was one of the local civil tribunals found in existence at the time the reconstruction laws were passed, and was not abolished by them, nor by any order of the commanding generals. It derived its existence from the same source from which the legal existence of this court emanates, from which we were allowed to call a convention to frame a constitution, the people were called upon to vote upon its adoption, to elect a governor, and choose members of the legislature and other officers. We have no officer in any department of our present government chosen under the Constitution of 1869. The Governor, Lieutenant Governor, heads of departments, members of the Legislature and local officers, all owe their official existence to the laws of Congress before referred to.

The courts which have been recognized by these laws, and the officers appointed to administer them, had an existence prior to the enactment of these laws themselves, and the judiciary of the State to-day is the only branch of the government which owes its existence to laws enacted by the people of Texas; whilst at the same time, the judges have, in perhaps every instance, been appointed by the military commander of the fifth military dis-

trict, yet they have been appointed in pursuance of laws already existing at the time of the passage of the reconstruction laws, which have never been set aside by Congress, or repealed by any authority so as to affect the legal existence of the courts. It is very true that we have adopted a new constitution, and under it have been readmitted to our former position in the Union ; but we have elected no Legislature, no Governor, no officers of any kind under it; but, under the reconstruction acts, we elected all these officers, expecting them to go forward, and by necessary legislation, organize a government for the State under it, and under the Constitution, laws and treaties of the United States.

The first section of the bill of rights in the Constitution of 1869, reads thus : " The Constitution of the United States, and the laws and treaties made and to be made in pursuance thereof, are acknowledged to be the supreme law ; that this Constitution is framed in harmony therewith, and in subordination thereto, and that the fundamental principles embodied herein can only be changed subject to the national authority."

This constitution, then, did not pretend to abrogate the authority of the laws under which it was framed, and without which it would have had no existence, but it is intended in due time, and under proper initiatory legislation, to furnish the people a permanent law for their government, paramount, except as to the Constitution and laws of the United States ; and to them by its own terms, it is in subordination.

General orders, No. 74, dated headquarters, fifth military district, April 16. 1870, section four, reads thus : " All civil officers will continue in the discharge of their present duties until relieved by qualified successors, to whom they will turn over all records and public property pertaining to their respective offices."

But this is no new principle of law ; on the other hand, it is the universal rule founded in the necessities of governments, that there shall be no void, hiatus, or interregnum in the offices of

government. That the king may die, or be dethroned, or cease to reign, are all facts admitted in monarchies, but none admit that the office of king can lapse; and upon the same principle the office of governor, of legislators, and of judges, will always exist. Yet the incumbents may and often do change, the old officer holding until his successor is prepared to take his place, except when vacancies occur unexpectedly, and when it is frequently provided that the office shall devolve upon some other designated person, as in the case of the Presidency, and Gubernatorial office of the different States.

We are, therefore, clearly of the opinion that the court in which appellant was tried was a legal tribunal of competent jurisdiction to try such cases, and that the plea to the jurisdiction was properly overruled.

The charge as asked by the defendant's counsel, and refused by the court, had been substantially given in the general charge, and was not improperly refused for this reason, nor was it entirely free from legal objection.

There is nothing in the law which forbids a jury from believing the evidence of an accomplice; but that the law will not support a conviction entirely upon his evidence, appears to be the better opinion of this court, and is the positive law of some of the States.

There was no error in allowing the trial to pause until the case of the State against Jules Mitchell, could be called for the purpose of allowing a *nolle prosequi* to be entered, preparatory to offering him as a witness. It was probably a step necessary to be taken to serve the ends of justice in this case. Nothing was done in the case to interrupt the trial. The State wanted to use Mitchell as a witness, and wished first to relieve him from an indictment which was pending against him for the same offense for which Johnson was tried, and there was no error in what was done.

But we are asked to grant a new trial in this case for supposed

error in the court below, overruling the special exception to the indictment on the ground that the grand jury was not drawn and summoned according to law. This exception was in the nature of a challenge to the array, and could not be sustained under Article 363, Criminal Code. (See also Paschal's Digest, Art. 2868.) The case of Martin against the State, 22 Texas, 215, declares what the law is under the code, and becomes authority in this case.

We have examined the record in this case with much care, and are unable to find any cause for reversing the judgment of the court below, and it is therefore affirmed.

Affirmed.